IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TIANA A. G. KAULA,

      Plaintiff,

v.                              No. CIV 16-0197 RB/SCY

MEGAN J. BRENNAN, Postmaster
General of the United States,

      Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment and 12(b)(1) Motion to Dismiss and Memorandum in Support, filed on July 20, 2017. (Doc. 31.) Jurisdiction arises under 28 U.S.C. § 1331. Having considered the submissions of counsel and relevant law, the Court will **GRANT** Defendant's motion.

## I.    Factual and Procedural Background[1]

Ms. Tiana Kaula (Plaintiff) began working full time with the United States Postal Service (USPS) in 1986. (Docs. 31-A at 18:13–17; 7 (Am. Compl.) ¶ 7.) In 2007, Plaintiff sustained a periscapular strain in an on-the-job auto accident. (Docs. 31-A at 38:18–25; Am. Compl. ¶ 8.) Consequently, Plaintiff had physical restrictions and began working subject to an "Offer of Modified Assignment," which reflected limits on the number of hours Plaintiff could perform certain duties. (Docs. 31-G; 31-J; 31-A at 26:17–23.) For example, Plaintiff's June 21, 2010 Offer limited the time she spent carrying the route (i.e., delivering the mail on her route) to 3.5

---

[1] In accordance with summary judgment standards, the Court recites all admissible facts in a light most favorable to the Plaintiff. Fed. R. Civ. P. 56; *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The Court recites only that portion of the factual and procedural history relevant to this motion.

1

hours. (*See* Docs. 31-J; 31-A at 28:15–19, 86:23–87:5.) This 3.5 hour restriction was in place as early as January 22, 2008. (*See* Doc. 6-2 at 9.[2])

First in 2008 and later in 2012, the USPS fired Plaintiff. (*See* Docs. 6-2; 31-L; 31-A at 26:11–12, 62:2–18.) Plaintiff asserts that both terminations came as retaliation for her physical restrictions. (*See* Docs. 31-A at 21:9–11; 26:11–12.) Plaintiff filed Equal Employment Opportunity (EEO) complaints after each termination (one in 2008, two in 2012). (*See* Docs. 31-L; 6-2; 31-K.) The EEO ruled in Plaintiff's favor after the 2008 termination and reinstated her with back pay and benefits. (*See* Doc. 6-2.) The parties settled Plaintiff's 2012 EEO complaints by signing a "Formal A Grievance Settlement" on January 9, 2013. (*See* Doc. 31-K.) This Settlement provided that Plaintiff's removal was "reduced to a 30 day time-off suspension with a retention period of two (2) years through January 9, 2015." (*Id.*) The Settlement did not grant Plaintiff any back pay, and it mandated that Plaintiff "relinquish her bid assignment at the Academy Station and become an unassigned regular." (*Id.*)

After she was reinstated in 2013, Plaintiff transferred to the Steve Schiff Building. (*See* Doc. 31-A at 26:6–13.) Again, Plaintiff returned to work under a modified job offer. (*See id.* at 26:20–23.) At the Steve Schiff Building, Plaintiff's chain of command included two floor supervisors (Joe Alberti and Peter Baldwin) and manager Scott Bissell. (*Id.* at 29:13–20.)

Plaintiff testified that her former floor supervisor at the Academy Station, Mr. Anthony Perez, told her that Mr. Bissell had been to the station to pick up Plaintiff's badge and identification card before she returned to work in 2013. (*Id.* at 65:10–15.) Plaintiff believes that

---

[2] The Court uses this exhibit's internal pagination rather than the CM/ECF pagination.

Mr. Bissell talked to someone at the Academy Station about her history and perhaps obtained Plaintiff's file, including her history of EEO complaints.[3] (*Id.* at 65:21-66:5.)

On Saturday, January 12, 2013, Plaintiff reported for what she believed was her first day at work at the Steve Schiff Station. (*Id.* at 84:2–12.) Her supervisor told her that it was actually her day off; he also advised her that before she could come back to work, she needed to obtain a new CA-17. (*See id.*) A CA-17 "is a form an employee's doctor fills out that is submitted to a supervisor so that the supervisor understands the employee's current physical restrictions." (Docs. 31 ¶ 15 (citing Doc. 31-A at 84–85, 117); 38 at 4.) Plaintiff's doctor's office was closed on January 12, 2013. (Docs. 38 at 4; 31-A at 84:2–85:8.)

Plaintiff was scheduled to work at the Steve Schiff Station on the morning of Monday, January 14, 2013. (*See* Doc. 31-A at 84:25–85:5) Rather than going to work, Plaintiff went to her doctor's office, hoping to be seen as a walk-in patient. (*See id.*; *see also* Doc. 31-B at 7.) Mr. Bissell called Plaintiff around 8:15 a.m. on January 14, 2013, and asked why she had not reported for work.[4] (*See* Docs. 31-A at 84:25–85:12; 31-B at 7.) Plaintiff said that she was trying to get a new CA-17 as directed. (Doc. 31-A at 6–8.) Mr. Bissell advised Plaintiff to come in to work. (*See* Doc. 31-B at 7.)

Plaintiff arrived for work at 9:00 a.m. and met with Mr. Bissell about her CA-17 and Offer of Modified Assignment. (*See id.* at 85:13–14, 86:16–88:18.) On January 14, 2013, both Plaintiff and Mr. Bissell signed an Offer of Modified Assignment that limited Plaintiff to 8 hours of work, which included 3.5 hours of driving to deliver mail and 2 hours of walking to deliver

---

[3] In response to Defendant's factual contentions regarding Plaintiff's history of EEO complaints, Plaintiff asserts that "[a]s is standard on all Union grievances to circumvent EEO filings, retaliation in any way warrants the previous agreements null and void." (*See* Doc. 38 at 3.) Plaintiff fails to cite any authority or develop any argument to support this assertion. (*See id.*)

[4] Plaintiff testified that she received this phone call from Mr. Alberti. (*See* Doc. 31-A at 85:2–3.) This discrepancy is immaterial for purposes of the Court's analysis.

mail based on the restrictions listed in Plaintiff's 2012 CA-17. (*See* Docs. 31-G; 31-H; *see also* Docs. 31 ¶ 16; 38 at 4, 10–11; 31-B at 5, 7.) While the right-hand column of the 2012 CA-17 included restrictions of walking for 2 hours per day and driving a vehicle for 3.5 hours per day, a note in the left-hand column of the form specifically restricted Plaintiff to "delivery/driving . . . 3.5 hrs/day." (Doc. 31-H.) This firm 3.5 hour restriction on delivery appears to conflict with the 2013 Offer of Modified Assignment, which defines Plaintiff's duties as "[w]alking to deliver" mail for 2 hours, and "[d]riving to deliver" mail for 3.5 hours. (Doc. 31-G.) Plaintiff was not satisfied with the Offer of Modified Assignment, presumably due to this discrepancy. (*See* Doc. 31-A at 86:16–88:18.) Mr. Bissell told Plaintiff that he was required to "follow the right side of the CA-17 on her limitations" and that she could obtain a new modified offer if she got an updated CA-17. (Doc. 31-B at 7.) She disagreed with him, but she signed the Offer "[p]ending approval of" the Office of Workers' Compensation Programs (OWCP) and her doctor.[5] (*Id.*; *see also* Doc. 31-B at 7.)

After her meeting with Mr. Bissell, Plaintiff left the station to begin delivering her mail around 10:05 a.m. (*Id.* at 88:19–90:2, 110:10–11.) Plaintiff stopped for lunch and realized that she had missed delivering to an apartment complex at the beginning of her route, so she backtracked to the apartment complex after she finished lunch. (*See id.* at 90:1–92:9.) Defendant asserts that Mr. Bissell drove Plaintiff's route at some point while she was out delivering mail,

---

[5] Plaintiff asserts that the document she signed on January 14, 2013, was actually Exhibit 31-J. (*See* Doc. 38 at 4–5 (noting that she signed the document "Signing under protest and in violation of my Weingarten Rights").) The date next to Plaintiff's signature on Exhibit 31-J, however, clearly shows that she signed that document on June 21, 2010. (Doc. 31-J.) Moreover, at Plaintiff's deposition, Plaintiff testified that when she signed the document on January 14, 2013, she signed it "under duress" and "put down OWCP and HR, because the modified assignment" Mr. Bissell offered her did not reflect what Mr. Bissell told her the requirements would be. (*See* Doc. 31-A at 88:1–8 (quotation marks omitted).) The document dated January 14, 2013, reflects that Plaintiff signed "[p]ending approval of OWCP [and doctor]." (Doc. 31-G.) Thus, Plaintiff has failed to bring "some affirmative indication that [her] version of relevant events is not fanciful[,]" *see Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (citation omitted), and the Court finds that Plaintiff signed Exhibit 31-G, and not 31-J, on January 14, 2013.

4

but he was unable to find her.[6] (Docs. 31-B at 7; 31-A at 94:25–95:4; 31 ¶ 22; 38 at 5.) Plaintiff testified that because she had delivered mail for 3.5 hours as she understood her Offer of Modified Assignment required, she returned to the station between 2:00 and 3:00 p.m. (*Id.* at 92:2–93:20.) Although Plaintiff delivered for 3.5 hours, she had not completed her entire assigned route. (*See* Docs. 31-A at 92:2–93:20; Docs. 31 ¶ 21; 38 at 5.)

Having heard that Plaintiff failed to complete her route and failed to complete the assigned hours as he understood them, Mr. Bissell approached Plaintiff on the dock where she was unloading the remaining mail from her truck. (*See* Docs. 31-A at 92:10–93:15; 31-B at 7.) Mr. Bissell said, "What the hell are you doing? Why are you bringing mail back?" (Doc. 31-A at 93:15–16.) Plaintiff attests that Mr. Bissell was less than two inches in front of her with his hands raised in fists and was "spitting on [her] face" as he yelled.[7] (*Id.* at 93:23–25, 108:5–21, 109:3–9; Doc. 52-N at 1.) Plaintiff explained to Mr. Bissell that she had been out since 10:00 a.m., and she could not do any more. (*Id.* at 94:6–17.) Mr. Bissell ordered her to go back out to deliver the rest of her route. (*Id.* at 94:1–24.) Mr. Bissell told Plaintiff she was "worthless" and said that he had tried to find her on her route, but she was not there. (*Id.* at 94:25–95:4.) Plaintiff explained that she had forgotten to deliver at the apartment complex and had returned to deliver there. (*Id.* at 95:5–20.) Mr. Bissell continued to yell at Plaintiff, called her "worthless" again, and then said "[t]his is ridiculous. You're a terrible carrier. . . . This is incredibly stupid." (*Id.* at 95:21–96:5.) Mr. Bissell then walked inside. (*Id.* at 96:6.)

---

[6] Plaintiff argues that there is no proof that Mr. Bissell went to look for her on her route, and that even if he did, he would have found her as she "did not deviate from [her] driving route." (Doc. 38 at 5.) The Court notes, however, that Plaintiff testified she took a lunch break at a restaurant then returned to the beginning of her route to deliver at the apartment complex. (*See* Doc. 31-A at 90:2–92:1.) Regardless, Plaintiff has failed to come forward with admissible evidence to dispute Mr. Bissell's assertion that he looked for her on the route and did not find her.

[7] Defendant presents an affidavit from Mr. Bissell, in which he asserts that he was never closer than 20 feet away from Plaintiff during this conversation. (*See* Doc. 31-B at 7.) The Court uses Plaintiff's version of the facts for purposes of its analysis.

Plaintiff proceeded to put her mail away, when Mr. Bissell came back out and told her to "[g]et off the work room floor." (*Id.* at 96:7–97:4.) Plaintiff said that she needed to complete her day's responsibilities, and Mr. Bissell ordered her again to "[g]et off the clock." (*Id.* at 97:5–17.) Plaintiff strongly felt she needed to follow procedure exactly, because she believed the USPS would fire her if she did not. (*Id.* at 97:23–98:9.) Plaintiff had to be "checked out" at the end of her shift, and she also needed to fill out a time card. (*See id.* at 99:3–7.) Mr. Bissell was the only person available to check Plaintiff out, and during this process, he accused her of falsifying her time sheet when she wrote that she came in at 9:00 a.m. (*See id.* at 99:8–100:23.)

Because this was Plaintiff's first day back at work after her previous EEO complaints had been resolved, she was expecting several "back paychecks" for the time she was gone. (*Id.* at 98:18–22.) After she checked out and signed her time sheet, Plaintiff asked Mr. Bissell for her back paychecks. (*Id.* at 101:15–16.) Mr. Bissell refused to give her the paychecks and said, "you're not ever coming back, and I'll send you home on a 16-7."[8] (*Id.* at 101:17–20.) Plaintiff asked for the form that he was sending her out on, and Mr. Bissell replied, "Go. Just leave. Just go. . . . If you're going to go on sick leave, fill out a 3971." (*Id.* at 101:21–25.) Plaintiff filled out the 3971 form to take sick leave for the rest of her shift and left the office. (*Id.* at 102:1–6.)

Plaintiff began crying and called her Union Steward, Steve McCully, who arranged for Plaintiff to come back to the station in an hour to pick up her paychecks from Mr. Baldwin. (*Id.* at 102:6–103:24; *see also* Doc. 38 at 11.) Plaintiff returned to the station, and Mr. Baldwin accompanied her to his office. (*Id.* at 104:10–23.) Mr. Bissell came into the office and said he

---

[8] A "16-7" is an emergency procedure in which the USPS puts an employee on "off-duty status (without pay) . . . where" there is an "allegation [of] intoxication (use of drugs or alcohol), pilferage, or failure to observe safety rules and regulations, or in cases where retaining the employee on duty may result in damage to U.S. Postal Service property, loss of mail or funds, or where the employee may be injurious to self or others." (Doc. 31-M at 2–3.)

6

had approved her checks. (*Id.* at 105:4–7.) Plaintiff signed for the checks and left. (*Id.* at 105:17–20.)

Plaintiff talked to Mr. McCully again and expressed that she could not "work like this." (*Id.* at 105:20–24.) On January 15, 2013, Plaintiff went to her doctor's office, where the doctor told her that she was suffering from PTSD and wrote her a note so that she would not have to return to work that day. (*Id.* at 106:2–14, 115:19–23.) Plaintiff took the doctor's note back to the station and showed it to Mr. McCully, and together, they brought it to Mr. Bissell. (*Id.* at 106:19–25.) Plaintiff asked Mr. Bissell for the "16-7 that [he was] sending [her] home with." (*Id.* at 106:23–107:1.) Mr. Bissell replied, "I just made that up[] because I was angry, because I was mad, because you really pissed me off." (*Id.* at 107:2–4.) Mr. Bissell also admitted that he had screamed at Plaintiff the day before. (*Id.* at 116:5–6.) Plaintiff gave Mr. Bissell the doctor's note and said she would go home sick or on leave without pay. (*Id.* at 107:12–16.) After the parties hashed out what hours to put on Plaintiff's time sheet for January 14, 2013, Plaintiff left and did not return to her job with the USPS. (*See id.* at 110:17–113:12; Doc. 31-B at 4.) Plaintiff successfully bid to work at another USPS station in February 2013; however, she did not actually work at that job. (*See* Docs. 52 at 7; 52-O ¶¶ 5–6.) On March 30, 2013, Plaintiff was placed on leave without pay. (Doc. 52-O ¶ 6.)

On April 24, 2013, Plaintiff filed her final EEO complaint, this time regarding Mr. Bissell's treatment of her, and the EEO conducted an investigation. (*See* Docs. 52-N; 31-B; 31-C; 31-D; 31-E; 31-F; 6-13; Am. Compl. ¶ 13.) Plaintiff's complaint states:

> I was discriminated against and reprisals were taken against me . . . when Scott Bissell degraded & verbally abused me. He physically threatened me red faced and closed fists while yelling orders that would exceed my medical restriction. This abuse and assault resulted in real harm, loss, pain and suffering. I have not been able to return to work due to the hostile environment. I am making a claim for this loss.

(Doc. 52-N at 1.) Plaintiff named Mr. Bissell, Ms. Rosarita Archuleta (her supervisor at the Academy Station), Mr. Perez, and Eric Martinez, the USPS Postmaster, as the individuals who had taken discriminatory action against her. (*See id.*) Plaintiff alleged that the discrimination was based on her race, color, national origin, sex, age, disability, and as retaliation for prior complaints. (*See id.*) Plaintiff testified that she marked all of the options because she wasn't sure why Mr. Bissell treated her the way he did, so she simply marked "everything that applied to" her. (*See* Doc. 31-A at 66:20–67:5.)

As part of the EEO investigation, Mr. Bissell completed an EEO Investigative Affidavit. (*See* Doc. 31-B.) Mr. Bissell, a white male, stated that he was unaware of Plaintiff's race, national origin, sex, age, or prior EEO activities. (*Id.* at 1, 4–5.) Mr. Bissell stated that neither Plaintiff's color, race, national origin, sex, age, medical condition, nor prior EEO activities were factors in how he treated her that day. (*Id.* at 4–5.) Mr. Bissell stated that he was aware that she signed a modified job offer that provided for an eight hour workday with certain physical restrictions.[9] (*See id.* at 4.)

Ultimately, the EEO found in the USPS's favor with respect to Plaintiff's complaint. (*See* Doc. 6-13.) Plaintiff, proceeding pro se, filed a Complaint in this Court on March 16, 2016, and a Corrected Amended Complaint on April 22, 2016. (Docs. 1, 6, 7.) Construing her Complaint liberally, it appears Plaintiff brings three claims: hostile work environment, retaliation, and constructive discharge.[10] (*See* Am. Compl. ¶¶ 18–19; Doc. 31 at 9; 31-A at 78:8–80:24.) Defendant now moves for summary judgment on Plaintiff's hostile work environment and

---

[9] Mr. Bissell's affidavit is somewhat contradictory, in that he also states that her "Modified Job Offer . . . had no medical restrictions . . . ." (Doc. 31-B at 3.) Three questions down on the same page of the affidavit, however, Mr. Bissell recites Plaintiff's physical restrictions per her Offer of Modified Assignment signed January 14, 2013. (*Id.*; *see also* Doc. 31-G.)

[10] While Plaintiff checked "disability" as one of the types of discrimination she claimed in her EEO complaint, she does not discuss her disability or the Americans with Disabilities Act in her Amended Complaint, nor does she provide any evidence in support of a finding that she has a disability.

8

retaliation claims, and moves to dismiss the constructive discharge claim on the basis that Plaintiff failed to exhaust her administrative remedies and that the Court lacks subject matter jurisdiction to hear the claim. (*See* Doc. 31.)

## II.  Legal Standards

Plaintiff's "pro se . . . pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (internal citation omitted)). The Court may not, however, "serv[e] as the litigant's attorney in constructing arguments and searching the record." *Id.* (citation omitted).

### A.  Summary Judgment Standard of Review

Summary judgment is appropriate when the Court, viewing the record in the light most favorable to the nonmoving party, determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id*. The moving party bears the initial responsibility of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (quotation marks omitted). The party opposing a motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990) (citing *Celotex*, 477 U.S. at 324). Rule 56(c) provides that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). The respondent may not simply "rest on mere allegations or denials of [her] pleadings." *Anderson*, 477 U.S. at 259; *see also Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980) ("However, once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.") (quotation omitted)). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Colony Nat'l Ins. Co. v. Omer*, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008) (citing Fed. R. Civ. P. 56(e); *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)). "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (citations omitted).

### B. Rule 12(b)(1) Standard of Review

Motions to dismiss under Rule 12(b)(1) "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." *Campos v. Las Cruces Nursing Ctr.*, 828 F. Supp. 2d 1256, 1265 (D.N.M. 2011) (quoting *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002) (internal citations omitted)). "On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true." *Id.* (quoting *Alto Eldorado Partners v. City of Santa Fe*, No. Civ. 08-0175 JB/ACT, 2009 WL 1312856, at *8 (D.N.M. Mar. 11, 2009), *aff'd*, 634 F.3d 1170 (10th Cir. 2011) (internal citations omitted)).

"But when the attack is factual, a district court may not presume the truthfulness of the complaint's factual allegations" and may "allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 [summary-judgment] motion." *Id.* (quoting *Alto Eldorado Partners*, 2009 WL 1312856, at *8–9). Here, Defendants attack the facts upon which subject matter jurisdiction is based—that is, whether Plaintiff exhausted her claims against them.

### III. Analysis

#### A. Hostile Environment Claim

Title VII prohibits an employer from discriminating against an employee "with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). Here, Plaintiff has alleged a claim of discrimination based on a hostile work environment due to her race, color,

11

national origin, sex, and/or age. (*See* Doc. 31-D.) Plaintiff "may make out 'a claim of . . . discrimination based on a hostile work environment' if she can 'show (1) that she was discriminated against because of her" race, color, national origin, sex, and/or age, "'and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment.'" *Morris v. City of Colo. Springs*, 666 F.3d 654, 663 (10th Cir. 2012) (quoting *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009) (internal quotation and citation omitted)).

### 1. Plaintiff fails to demonstrate discrimination based on race, color, national origin, sex, and/or age.

Plaintiff admitted in her deposition that she alleged discrimination on a variety of bases because Mr. Bissell's actions were "nonspecific." (Doc. 31-A at 67:2–3.) That is, Plaintiff was not aware of any reason Mr. Bissell might have discriminated against her, "so [she] put down everything that applied to" her. (*Id.* at 66:20–67:5.) Plaintiff offers no evidence, however, to demonstrate that Mr. Bissell discriminated against her based on a protected status. The only evidence Plaintiff offers is Mr. Bissell's statement that she was "worthless" and yelled at her with closed fists. This conduct, while reprehensible, is insufficient to show discriminatory intent.

### 2. Plaintiff fails to show that any alleged discrimination was severe or pervasive.

Even if Plaintiff were able to establish discrimination based on a protected status, she has failed to show that Mr. Bissell's conduct was sufficiently severe or pervasive to withstand summary judgment. A hostile work environment is one that "is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Morris*, 66 F.3d at 664 (quoting *Hall v. U.S. Dep't of Labor, Admin. Review Bd.*, 476 F.3d 847, 851 (10th Cir. 2007)

(internal quotations omitted)). "Pervasiveness and severity are independent and equal grounds"; thus, the Court will examine whether Plaintiff has come forward with facts sufficient to meet either standard. *Witt v. Roadway Exp.*, 136 F.3d 1424, 1432 (10th Cir. 1998) (citations omitted).

Plaintiff points to only one incident of offensive conduct at her workplace: the January 14, 2013 confrontation between Plaintiff and Mr. Bissell. "To fulfill [her] burden under the pervasiveness standard, the plaintiff must show more than a few isolated incidents of . . . enmity." *Witt*, 136 F.3d at 1432 (quotation marks and citation omitted). In *Witt*, where the plaintiff brought a claim for racial discrimination, the Tenth Circuit noted that pervasiveness may be shown by "a steady barrage of opprobrious racial comments." *Id.* (addressing a hostile environment claim under 42 U.S.C. § 1981) (quotation and citation omitted); *see also Aramburu v. Boeing Co.*, 112 F.3d 1398, 1410 (10th Cir. 1997) (noting that "standards and burdens under § 1981 are the same as those under Title VII) (citing *Durham v. Xerox Corp.*, 18 F.3d 836, 838–39 (10th Cir. 1994)). Accordingly, the *Witt* Court found that two incidents of racially charged language over the span of two years were insufficient to be deemed pervasive. *Id.* (quotation omitted). Similarly, this single incident of inexcusable management on Mr. Bissell's part is not pervasive as a matter of law.

Having failed to show pervasiveness, Plaintiff must meet the severity standard. Only an event that is "extraordinarily severe" is enough to "qualify as an adverse employment action." *See Gerald v. Locksley*, 849 F. Supp. 2d 1190, 1235 (D.N.M. 2011) (quotations omitted). A single incident must "constitute an 'intolerable alteration' of the plaintiff's working conditions," *id.* (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000)), "so as to substantially interfere with or impair [her] ability to do [her] job," *id.* (citing *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 59 (2d Cir. 2004)). Plaintiff argues that this single instance of

verbal abuse, coupled with a threatening posture while standing nose-to-nose with Plaintiff, qualifies. The Court disagrees. The Court accepts that Plaintiff felt threatened, and it is clear that Mr. Bissell's behavior was unprofessional and boorish. His threatening posture and choice of words, however, are simply insufficient to meet the severity standard. The Court finds support for this conclusion in a number of decisions.

First, in *Yang v. Lakewood Management L.L.C.*, 918 F. Supp. 2d 1205 (D. Kan. 2013), the plaintiff described three incidents of physical harassment that occurred on one day: "a co-worker put some peanut butter on plaintiff's head[,]" someone threw a paper wad at plaintiff, and later, someone put pepper sauce on plaintiff's head, causing an injury to the plaintiff's eye. *Yang*, 918 F. Supp. 2d at 1206. The *Yang* Court found that these incidents, even though they were physical assaults, were altogether insufficient for the plaintiff to "allege[] plausible grounds for a Title VII claim of harassment or hostile work environment." *Id.* at 1208.

In *Morris v. City of Colo. Springs*, the plaintiff, a registered nurse, alleged that a surgeon flicked her on the head with his finger twice, made demeaning comments to her, and threw pericardium tissue at her during a surgery. *Morris*, 666 F.3d at 658–59. The Tenth Circuit, noting that "Title VII does not establish 'a general civility code,'" disagreed that these incidents, "viewed objectively, could be deemed 'severe.'" *Id.* at 663, 666 (quotation and citation omitted). The court emphasized that single or isolated incidents must be "especially egregious or extreme . . . ." *Id.* at 667 (citations omitted). Plaintiff's case differs from both *Yang* and *Morris* in that Mr. Bissell never actually touched Plaintiff. While he did get close enough to her that he spit on her when he yelled, such slight contact is simply too minor to be actionable.

Finally, in *Howley v. Town of Stratford*, the Second Circuit found that a plaintiff had asserted facts sufficient to show a hostile work environment when she alleged that she was

14

subjected to "an obscene and humiliating verbal tirade that undermine[d her] authority in the workplace." *Gerald*, 849 F. Supp. 2d at 1236 (discussing *Howley*, 217 F.3d at 154). Specifically, while in the presence of a large group of men at a work-related meeting, the plaintiff's coworker made obscene comments "at length [and] loudly," called the plaintiff obscene names (i.e., "cunt"), and asserted that she "had gained her office of lieutenant only by performing fellatio." *Howley*, 217 F.3d at 148, 154. Here, Mr. Bissell yelled at Plaintiff at her workplace and called her worthless, but his treatment of Plaintiff was far less severe than the verbal assault perpetrated by the coworker in *Howley*. There is no evidence that Mr. Bissell called Plaintiff any names that were derogatory or based on a protected status, nor is there evidence that Plaintiff was surrounded by coworkers.

Based on the facts alleged, the Court holds no reasonable jury could find that Mr. Bissell's conduct was sufficiently severe to constitute a hostile work environment. Accordingly, the Court grants Defendant summary judgment on this claim.

### B. Retaliation Claim

Title VII prohibits employers from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3. Here, Plaintiff asserts that Mr. Bissell's conduct was retaliatory due to her previous EEO complaints. (*See* Doc. 38 at 8.) To support her claim, Plaintiff argues that Mr. Bissell picked up some documents from her previous station prior to her start date in January 2013. (*Id.* at 14.) While he was there, Plaintiff contends that he must have talked to management about Plaintiff and her history of EEO complaints. (*Id.*) Plaintiff offers no evidence to support this theory. Because Plaintiff has only "indirect or circumstantial

evidence of discriminatory animus," the Court analyzes her claim using the *McDonnell Douglas* burden shifting framework. *See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) (citation omitted); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

To state a *prima facie* case of retaliation, Plaintiff must show "that (1) she engaged in protected opposition to discrimination; (2) she suffered an adverse action that a reasonable employee would have found material; and (3) a causal nexus exists between her opposition and the employer's adverse action." *Montes*, 497 F.3d at 1176 (citations omitted). At issue here is the third prong. "To satisfy this element, a 'plaintiff must show that the individual who took adverse action against [her] knew of the employee's protected activity . . . .'" *Id.* (quoting *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993) (internal citation omitted)). Plaintiff contends that because Mr. Bissell had to approve back paychecks for Plaintiff, he would have known that these were due as part of an EEO settlement. (*See* Doc. 38 at 6.) Viewing all facts in a light most favorable to Plaintiff, and recognizing that this is a stretch, the Court finds that Plaintiff has met this element.

Having stated a *prima facie* case of retaliation, the burden shifts to Defendant to produce evidence that Mr. Bissell's treatment of Plaintiff was due to "a legitimate, nondiscriminatory reason." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (quotation omitted). Here, there is evidence to show that Mr. Bissell became upset with Plaintiff both because he had looked for Plaintiff on her route and could not find her, and because she returned to the station without finishing her route. (Doc. 52 at 11 (citing Doc. 31-B at 7[11]).) Mr. Bissell was also under the impression that Plaintiff had not worked according to the restrictions listed on the right-hand column of her CA-17. (*See* Docs. 31-B at 7; 31-H.) Plaintiff argues that Mr. Bissell contradicts himself in his affidavit (Doc. 38 at 6, 11–12, 13), and that it is unclear "why

---

[11] The Court notes that Defendant consistently cites to incorrect exhibits throughout her motion and reply briefs.

he acted out with hostility to the Plaintiff" (*id.* at 13). Plaintiff fails to elaborate on this argument. Regardless, Defendant's "burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). Thus, the Court finds that Defendant has met its burden to show a legitimate, non-discriminatory reason for Mr. Bissell's outburst.

Having met its burden of production, the burden again shifts to Plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143 (quotation and citation omitted). "That is, the plaintiff may attempt to establish that [she] was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Tex. Dep't of Comm'y Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (internal citation omitted)). It is clear here that Plaintiff cannot prove by a preponderance of the evidence that Mr. Bissell's reason was a pretext, as she admits that it is unclear "why he acted out with hostility to the Plaintiff." (Doc. 38 at 13). For this reason, the Court grants summary judgment in favor of Defendant on this claim.

### C. Constructive Discharge Claim

#### 1. Plaintiff failed to exhaust her constructive discharge claim.

Defendant argues that Plaintiff failed to include a claim for constructive discharge in her EEO complaint. (Doc. 31 at 17–19.) "Exhaustion of administrative remedies is a 'jurisdictional prerequisite' to suit under Title VII." *Jones v. Runyon*, 91 F.3d 1398, 1399 (10th Cir. 1996) (quoting *Sampson v. Civiletti*, 632 F.2d 860, 862 (10th Cir. 1980) (internal citations omitted)). Thus, if Plaintiff failed to exhaust her administrative remedies with respect to her constructive discharge claim, then this Court is without jurisdiction to consider it.

Plaintiff asserted the following in her EEO Complaint: "I was discriminated against and reprisals were taken against me . . . when [Mr.] Bissell degraded & verbally abused me. . . . I have not been able to return to work due to the hostile environment." Doc. 52-N at 1. Plaintiff's statement that she has "not been able to return to work due to the hostile environment" sounds very much like a claim of constructive discharge, which lies where an employer creates "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004) (citations omitted).

Defendant contends, however, that Plaintiff was bound to amend her EEO complaint to include constructive discharge, because it was clear from the EEO's Acceptance for Investigation Letter that her claims did not include constructive discharge. (*See* Doc. 31 at 17–19.) The EEO's letter outlined the specific issues in Plaintiff's complaint as follows:

> Specific issue(s): You allege you were subjected to a hostile work environment based on Race (Unspecified), Color (Unspecified), National Origin (Unspecified), Sex (Female), Age (DOB 11/24/1955), Retaliation (Prior EEO Activity) and Disability (Shoulder, Neck) when on January 14, 2013, you were degraded, verbally abused, and threatened red faced and closed fists while yelling orders that would exceed your medical restrictions.

(Doc. 31-E.) The letter went on to provide: "If you do not agree with the defined <u>accepted</u> issue(s), you must provide a written response specifying the nature of your disagreement within seven (7) calendar days of receipt of this letter to the EEO Services Analyst at the address below." (*Id.*)

The EEO letter clearly does not include a claim for constructive discharge. Plaintiff admits that she did not send a response to amend her complaint to add a constructive discharge claim. (*See* Doc. 31-A at 70:18–73:17.) The Tenth Circuit has "found that a constructive discharge claim is a 'discrete discriminatory act' that must be exhausted, even if other similar discriminatory conduct related to the constructive discharge has already been exhausted." *Rucker*

18

*v. Lew*, No. 2:13-CV-00944-DBP, 2015 WL 5026913, at *2 (D. Utah Aug. 25, 2015) (quoting *Chapman v. Carmike Cinemas*, 307 F. App'x 164, 174 (10th Cir. 2009) (internal quotation omitted)). Thus, while the language Plaintiff used in her complaint is evidence of her intent to bring a constructive discharge claim, she failed to exhaust the claim when the EEO did not include it as an issue and Plaintiff did not amend her complaint to specifically include constructive discharge. It is Plaintiff's burden to show that this Court has subject matter jurisdiction, and Plaintiff has failed to carry that burden. *See Campos*, 828 F. Supp. 2d at 1265 (citation omitted).

### 2. Plaintiff's constructive discharge claim fails on the merits.

Even if Plaintiff had exhausted her constructive discharge claim, she has failed to assert facts sufficient to withstand summary judgment. As Defendant points out, a constructive discharge claim has a "more demanding standard" than a hostile work environment claim. *Gerald v. Locksley*, 785 F. Supp. 2d 1074, 1121 (D.N.M. 2011) (citations omitted). (*See* Doc. 52 at 8.) Indeed, the Tenth Circuit has described constructive discharge "as an aggravated case of . . . hostile work environment." *Hall v. U.S. Dep't of Labor, Admin. Review Bd.*, 476 F.3d 847, 851 (10th Cir. 2007) (quoting *Suders*, 542 U.S. at 146). "In either case, the plaintiff must show that [she] was targeted for harassment because of [her] protected activity." *Id.* (citation omitted). This Plaintiff has failed to do. Thus, the Court will grant Defendant's motion with respect to Plaintiff's constructive discharge claim.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment and 12(b)(1) Motion to Dismiss and Memorandum in Support (Doc. 31) is **GRANTED**, and this case is **DISMISSED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**